UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID P. ROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:18-CV-1802-SPM |
| | ) | |
| | ) | |
| | ) | |
| ANDREW M. SAUL, [1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Andrew M. Saul, Commissioner of Social Security (the "Commissioner") denying the

application of Plaintiff David P. Rooks ("Plaintiff") for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act"). The parties consented

to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 8).

Because I find the decision denying benefits was not supported by substantial evidence, I will

reverse the Commissioner's denial of Plaintiff's application and remand the case for further

proceedings.

---

[1] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security. Pursuant to
Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill
as defendant in this action. No further action needs to be taken to continue this suit by reason of
the last sentence of 42 U.S.C. § 405(g).

## I.  PROCEDURAL BACKGROUND

On July 20, 2015, Plaintiff applied for DIB, alleging that he had been unable to work since February 1, 2012. (Tr. 332-33). His application was initially denied. (Tr. 258-62). On  December 10, 2015, Plaintiff filed a Request for Hearing by Administrative Law Judge ("ALJ") (Tr. 263). On August 16, 2017, an ALJ held a hearing. (Tr. 189-241). On September 15, 2015, the ALJ issued an unfavorable decision. (Tr. 168-86). On February 27, 2018, Plaintiff requested review by the Appeals Council. (Tr. 323-25). On August 30, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1-7). The decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.  FACTUAL BACKGROUND

On August 16, 2017, Plaintiff testified at the hearing before the ALJ as follows. Plaintiff was born on December 17, 1962. (Tr. 192). He has a driver's license and occasionally drives, typically to his doctor's appointments and to a food pantry. (Tr. 192). He has finished high school. (Tr. 194). His most recent job was as a production operator, which ended in October 2014. (Tr. 194-95). He first hurt his back in 2012, but he kept working until October 29, 2014, even though his back kept giving out and he would be unable to work. (Tr. 195). He also had a motorcycle accident where he broke two fingers, and it also caused neck pain. (Tr. 219). Plaintiff testified that he is unable to work because of multiple problems: GERD; acid reflux; mental disorders that cause him to hear voices, have nightmares, have diminished capacity, and have trouble speaking; excruciating pain in his back, spine, and neck; severe headaches; blurred vision; trouble with balance; joint pain in his hand and elbow; and IBS. (Tr. 196-97). His pain in his head, neck, shoulders, left elbow, left hand fingers, back, and hip are at a pain level of a 9/10 or 10/10. (Tr.

197-98). Plaintiff takes 25 different medications. (Tr. 211-12). The one he takes for sleep makes him unable to hear his alarm clock or get up. (Tr. 212).

At the hearing, Plaintiff was wearing a back brace that was prescribed by his doctor. (Tr. 202). He wears it pretty much every day if he is going to be moving around. (Tr. 203). He was also wearing a brace on his left hand, which also he got through a doctor. (Tr. 203). He wears it almost every day. (Tr. 204). Plaintiff was also using a cane on the day of the hearing, which Plaintiff believes was prescribed by his doctor in 2012. (Tr. 204). Plaintiff cannot get around without his cane, and he has used it every day since 2012. (Tr. 205). It helps with his balance. (Tr. 205). He has special pain relief shoes, but they were not prescribed by a doctor. (Tr. 205-06). Plaintiff prepares some simple meals for himself, and he dresses and bathes himself with difficulty (Tr. 213-14).  He does his own laundry but does not do any mopping, sweeping, vacuuming, or yard work. (Tr. 215-16). He goes to the grocery store two to three times a month, and he goes to church most Sundays. (Tr. 217-28). During the day, he mostly tries to be comfortable and sleep. (Tr. 217).

Plaintiff can walk or stand for about 10 to 20 minutes before he has to rest, and he needs to rest for hours. (Tr. 221-22). It also hurts his back to sit, and he frequently has to stand up and sit down. (Tr. 222). Plaintiff's pain symptoms are made worse by prolonged standing, prolonged sitting, and lifting heavy objects. (Tr. 200). He can "feel it" in his back if he lifts anything over five to ten pounds. (Tr. 201). He takes naproxen and muscle relaxers, and he has pain patches, but nothing reduces his pain. (Tr. 201). The only comfort he got was temporary, when he was going through physical therapy and using  a swimming pool. (Tr. 201).

Plaintiff testified that his memory used to be good but now he has trouble remembering new things. (Tr. 207). His concentration is terrible. (Tr. 207). He does not feel safe around crowds of people, and he does not really have any friends. (Tr. 207). Plaintiff was in the Navy and was

honorably discharged. (Tr. 219). He has PTSD from his experiences in the Navy and has episodes

of panic attacks. (Tr. 219). Plaintiff hears voices in his ears and has nightmares. (Tr. 223-24).

Plaintiff testified that his former employer abused him, and he knows they have been trying to stop

him from getting benefits. (Tr. 224). He thinks they are watching him and listening to him through

the phone or television, and that someone is following him around. (Tr. 224). He believes that his

former employer had something to do with the installation of a water meter on his building, which

he believes is a camera. (Tr. 224).

The record contains numerous treatment records, as well as several medical opinions

regarding Plaintiff's mental and physical impairments. The Court will cite to specific medical

records below, as needed to address the parties' arguments.

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she

is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health*

*& Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled

a person who is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must

be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot,

considering his [or her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such work

exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for

him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled;

if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1560(c)(2).

## IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff engaged in substantial gainful activity from February 2012 to October 2014, but that there had been a continuous 12-month period during which he did not engage in substantial gainful activity and that her remaining findings would address that period; that Plaintiff had the severe impairments of left middle finger degenerative joint disease, major depressive disorder, and anxiety; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 173-76).The ALJ found that Plaintiff had the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can handle and finger items frequently with the left hand; limited to perform simple, routine and repetitive tasks, simple work-related decisions; able to interact with supervisors and the public occasionally; and able to interact with coworkers frequently.

(Tr. 177). At Step Four, relying on the testimony of a Vocational Expert, the ALJ found Plaintiff was capable of performing his past relevant work as a general production helper, which was at the heavy exertional level as performed by Plaintiff and at a medium exertional level as generally performed. (Tr. 180-81). The ALJ also found, in the alternative, that there are other jobs existing in the national economy that Plaintiff is capable of performing, including bakery helper, laundry worker, and bander wrapper. (Tr. 181-82). Accordingly, the ALJ found that Plaintiff was not under a disability, as defined in the Act, from February 1, 2012, through the date of her decision (January 2, 2018). (Tr. 182).

## V. DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds: (1) that the ALJ failed to properly evaluate the credibility of Plaintiff's subjective complaints; (2) that the ALJ failed to properly evaluate Plaintiff's severe physical impairments at Step Two, in particular his back pain, and (3) that the ALJ failed to properly consider the opinion evidence, in particular the opinion of Dr. Plaintiff's treating physician, Dr. William Irvin, and the opinion of Dr. John Hogg, Ph.D.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *see also* 42 U.S.C. § 405(g); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942. *See also Biestek*, 139 S. Ct. at 1154

("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison*, 305 U.S. at

229).

In determining whether substantial evidence supports the Commissioner's decision, the

court considers both evidence that supports that decision and evidence that detracts from that

decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012). However, the court "'do[es]

not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations

regarding the credibility of testimony, as long as those determinations are supported by good

reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894

(8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the ALJ's findings,

the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011)

(quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

**B.  The ALJ's Findings Regarding Plaintiff's Back Pain at Step Two**

The Court first considers Plaintiff's argument that the ALJ erred in evaluating Plaintiff's

back pain and degenerative disc disease at Step Two. At Step Two, the ALJ must determine

whether the claimant has a "severe" impairment that lasted or is expected to last for at least twelve

months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); 404.1509. To show that an impairment

is severe, a claimant must show that he or she has a medically determinable impairment or

combination of impairments that significantly limits his or her physical or mental ability to perform

basic work activities, without regard to age, education, or work experience. *See* 20 C.F.R.

§§ 404.1520(a)(4)(ii), (c); 404.1521(a). "An impairment is not severe if it amounts only to a slight

abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Although the requirement of severity is not an "onerous requirement for the claimant to meet," it is "not a toothless standard." *Kirby*, 500 F.3d at 707. It is Plaintiff's burden to prove the existence of severe impairments. *Id.*

At Step Two, the ALJ found that Plaintiff's only severe impairments were left middle finger degenerative joint disease, major depressive disorder, and anxiety; she did not find Plaintiff's degenerative disk disease to be a severe impairment. (Tr. 174). Consistent with this finding, in the RFC assessment, the ALJ found that Plaintiff was capable of performing work at all exertional levels, with no limitations on sitting, standing, lifting, or walking.

Plaintiff argues that the evidence shows that Plaintiff suffers from degenerative disk disease and low back pain that precludes his ability to lift up to 20 pounds frequently and to stand and/or walk a good deal of the day. Plaintiff also argues that the ALJ's failure to evaluate his functional limitations from degenerative disk disease of the lumbar spine affected the outcome of the case, because if he were limited to sedentary work prior to his 55th birthday, or to light work after his 55th birthday, he would be disabled under the Grid rules.

After careful review of the record, the Court does not find substantial evidence to support either the ALJ's finding that Plaintiff's back impairment was non-severe or the ALJ's finding that Plaintiff was capable of performing work at all exertional levels. The Court acknowledges that the ALJ was under no obligation to give full weight to Plaintiff's subjective complaints regarding the severity of his back impairment. However, after review of the record as a whole and the ALJ's decision, it is unclear to the Court how the ALJ reached the finding that Plaintiff's back impairment imposed *no* significant limitations on his ability to perform work. As discussed above, Plaintiff testified that he had excruciating back pain, serious associated limitations on walking, sitting,

standing, and lifting, and limited daily physical activities due to pain. (Tr. 196-97, 215-16, 221-22). Additionally, the medical records show that Plaintiff frequently complained of back pain, often severe, to his treatment providers (Tr. 572, 580, 599, 606, 625, 633, 644, 653, 659, 669, 684-85, 701, 962, 1062, 1094, 1098, 1159, 1250, 1255, 1258-59, 1503, 1535, 1548, 1559, 1642, 1679); went to the emergency room for back pain on multiple occasions (Tr. 696-97, 1145-46, 1502-03); was referred to (and went to) physical therapy and aquatic/exercise therapy for back pain and functional limitations (Tr. 475-79, 486, 582-94, 625, 632, 652, 658, 669, 683); was treated with Toradol injections, lidocaine patches, Robaxin, naproxen, and Vicodin (Tr. 603, 694, 714, 720, 1506, 1680); was diagnosed with conditions including "back pain—chronic," "degeneration of interver disc," and "degeneration of lumbar intervertebral disc" (Tr. 599, 720, 1680); was often observed using a cane for ambulating (Tr. 508, 646, 701, 710, 719, 962, 1026, 1032, 1252, 1300, 1506, 1684); had an MRI showing disk bulges at L3-4, L4-5, and L5-S1 (Tr. 440); and was on many occasions observed to have objective findings that appear to support a severe back impairment, including limited range of motion and/or pain with range of motion (Tr. 627, 635, 646, 655, 671, 719, 714), positive straight leg test (Tr. 714), slow gait (Tr. 646, 714), paraspinal spasms in the lower back (Tr. 697), and pain or tenderness to palpation (Tr. 714, 719, 1252, 1506). This evidence, much of which was not discussed by the ALJ, appears inconsistent with the finding that Plaintiff can perform work at all exertional levels with no physical limitations aside from those associated with use of the left hand.

The Court also notes that some of the statements made by the ALJ to support her finding that Plaintiff's back impairment imposed no limitations are not supported by the record. The ALJ noted that Plaintiff "completed courses of physical therapy, aquatic therapy, and home exercise for his back pain" and that "[d]espite meeting all goals in therapy, he consistently reported no

improvement. This is inherently inconsistent." (Tr. 179). After review of the physical therapy and aquatic therapy records, the Court finds no inconsistency; the records actually show that Plaintiff did *not* meet most of the goals set by his physical therapist. At Plaintiff's first physical therapy appointment, his physical therapist set out several specific short-term and long-term goals. (Tr. 674). In the discharge summary entered at Plaintiff's final appointment, his physical therapist reported Plaintiff's progress on those goals as follows. (Tr. 605-10). The short-term goal of Plaintiff being independent with a home program after four weeks was "met." The short-term goal of Plaintiff self-reporting 25% improvement was "not met." The long-term goal of Plaintiff reporting at least 50% improvement was "not met." The long-term goal of Plaintiff reporting being able to walk three blocks with assistive device and pain raising to no higher than five was "not met." The long-term goal of Plaintiff reporting minimal or no difficulty dressing was "not met." The long-term of Plaintiff reporting lifting at least 15 pounds with minimal or no difficulty was "not met." (Tr. 609-10). Consistent with these results, Plaintiff reported little to no improvement in pain, walking, standing, or lifting at most of his physical therapy appointments (Tr. 659, 653-54, 633-34, 625-26, 606). Additionally, objective findings at his final physical therapy appointment were similar to those at his first appointment. At his first appointment, he had objective findings of "lumbar AROM ext 25, pain, flex 70, pain," (Tr. 671), and at his final appointment he had objective findings of "lumbar AROM extension 20, pain; flexion 80, pain." (Tr. 608). These records support Plaintiff's claim of severe and limiting back pain that did not respond to physical therapy.

With regard to aquatic/exercise therapy, Plaintiff's treatment provider did note that Plaintiff had "met all of their defined goals" and was being transferred to a self-directed exercise program. (Tr. 584). However, the defined goals were simply that "Patient will be able to tolerate

prescribed exercise routine. Patient will be given 4 appointments for therapy" and that "Patient will be able to self-direct land based/aquatic exercise. Patient will be able to document their own vital signs." (Tr. 583-84). The fact that Plaintiff met these goals does not suggest that he experienced any level of functional or symptomatic improvement.

For all of the above reasons, the Court finds that remand is required for the ALJ to reevaluate whether Plaintiff's back impairment was a severe impairment and what limitations should be included in the RFC related to that impairment. Because this re-evaluation will likely directly affect the ALJ's evaluation of Plaintiff's subjective symptoms, the Court need not address Plaintiff's arguments related to the ALJ's analysis of those symptoms. However, the Court will address Plaintiff's argument regarding the ALJ's evaluation of the medical opinion evidence related to Plaintiff's mental impairments.

### C. The ALJ's Evaluation of the Medical Opinion Evidence

Plaintiff's next argument is that the ALJ did not properly weigh the medical opinion evidence in the record, in particular the opinion of Plaintiff's treating psychiatrist, Dr. Irvin. Under the regulations applicable to Plaintiff's claim, if the Social Security Administration finds that a treating source's medical opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Social Security Administration will give that opinion "controlling weight." 20 C.F.R. § 404.1527(c)(2).[2] When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must evaluate the

---

[2] These regulations apply to claims filed before March 27, 2017. For claims filed after March 27, 2017, the rule that a treating source opinion is entitled to controlling weight has been eliminated. See 20 C.F.R. § 404.1520c(a). Because Plaintiff's claim was filed in 2015, the Court will apply the version of the regulations that applies to claims filed before March 27, 2017.

opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ may discount a treating physician's opinion where, for example, "other medical assessments are supported by better or more thorough medical evidence," *Goff*, 421 F.3d at 790 (internal quotation marks omitted), or the opinion "is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). "When an ALJ discounts a treating physician's opinion, [the ALJ] should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotation marks omitted).

Dr. Irvin offered several opinions in this case. On August 25, 2015, Dr. Irvin wrote a letter stating, "I am writing to confirm my medical opinion that you are and have been suffering from Major Depressive Disorder, Severe, with resultant low mood, concentration problems, energy deficit, insomnia, anorexia, physical problems (headaches, GI problems, etc.) It is opinion [sic] that the depression is preventing your ability to maintain gainful employment at this time. (Tr. 1302). The letter was accompanied by a check-box form on which Dr. Irvin checked boxes including anxiety, depression, headaches, long-term memory loss, impaired learning, personality changes, irritability, fatigue, social withdrawal, attention impairment, speech difficulties, change in personality, difficulty concentrating, loss of balance, and loss of coordination. (Tr. 1303).

On August 9, 2017, Dr. Irvin completed a "Medical Source Statement—Mental Health" for Plaintiff. (Tr. 1272-77). Dr. Irvin noted that he had his first visit with Plaintiff in December 2014 and sees him every one to twelve weeks. (Tr. 1272). He indicated that Plaintiff's mental health diagnosis was Major Depressive Disorder, Recurrent, Severe, with psychotic features. (Tr.

1272). He has been treated with medications and psychotherapy, and his response has been quite limited. (Tr. 1272). His medications cause side effects including possible fatigue and possible dizziness. (Tr. 1272). He noted that his clinical findings of anxiety, depression, and suspicion demonstrated the severity of Plaintiff's symptoms. (Tr. 1272).

On a checklist form, Dr. Irvin indicated that Plaintiff's symptoms include anhedonia or pervasive loss of interest in almost all activities; decreased energy; thoughts of suicide; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; pathologically inappropriate suspiciousness or hostility; sleep disturbance; and a history of multiple physical symptoms (for which there are no organic findings) of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often, and alter life patterns significantly. (Tr. 1273).

Dr. Irvin found that Plaintiff had no useful ability to function or would be unable to meet competitive standards in any mental ability needed to unskilled work, including remembering work-like procedures, understanding and remembering very short and simple instructions, maintaining attention for a two-hour segment, making simple work-related decisions, dealing with normal work stress, and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 1274). He found that Plaintiff also had no useful ability to function in any ability needed to do semiskilled or skilled work. (Tr. 1275). He found Plaintiff had no useful ability to interact appropriately with the general public or to maintain socially appropriate

behavior. (Tr. 1275). Dr. Irvin explained that Plaintiff is seriously depressed and anxious, with low mood, low energy, poor concentration, and distractibility. (Tr. 1275). Dr. Irvin also opined that Plaintiff's depression and anxiety heighten his physical discomfort. (Tr. 1275). Dr. Irvin opined that the following demands of work are ones Plaintiff would find stressful: speed, precision, or complexity, working within a schedule, making decisions, exercising independent judgment, completing tasks, working with other people, dealing with supervisors, being criticized by supervisors, simply knowing that work is supervised, remaining at work for a full day, and fear of failure at work. (Tr. 1276). Dr. Irvin also opined that Plaintiff would be absent from work more than four days per month due to impairments or treatment. (Tr. 1276).

In addition to the above, Dr. Irvin wrote several other short letters stating his opinion that Plaintiff was disabled or unable to pursue gainful employment, and/or describing Plaintiff's symptoms and conditions. (Tr. 581, 703, 1016, 1067, 1229, 1717).

With regard to Dr. Irvin's statements that the Plaintiff was disabled or could not pursue gainful employment, the ALJ stated, "Dr. Irvin's statements fail the claimant in that he draws conclusions reserved for the Commissioner. The issue of disability involves mixed medical, legal, and vocational issues. While Dr. Irvin may be qualified to draw medical conclusions, the same cannot be said with respect to vocational and legal conclusions as treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significant. Therefore, Dr. Irvin's conclusion on the ultimate issue is not case dispositive. (Tr. 179) (internal citations omitted).

With regard to Dr. Irvin's other statements, the ALJ stated:

> [Dr. Irvin's opinion] is completely inconsistent with his treatment notes. Dr. Irvin repeatedly reported the claimant was cooperative, made good eye contact, had no abnormal movements, that his affect was calm and his mood stressed, that his speech was without pressure and was elicitable and directable without pressure.

15

The claimant's thoughts were organized without flight of ideas, loose associations, circumstantiality, or blocking. The claimant denied suicidal ideation, homicidal ideation, auditory hallucinations, visual hallucinations, or suspicions. He was fully alert with good insight and judgment. When viewed in conjunction with 12F, it is apparent that Dr. Irvin seemed willing to write anything the clamant requested. Dr. Irvin completed a Medical Source Statement – Mental Health form (11F) wherein he checked almost every box, including loss of balance, loss of coordination, long-term memory loss, and impaired learning. Doctor Irvin's treatment notes and other mental health treatment notes do not support many symptoms checked on the form. Further, there is no objective medical evidence in the record to support these symptoms. Although Dr. Irvin is a medical doctor, his assessing the claimant's physical symptoms falls outside the scope of his specialty. The undersigned can only conclude that this check-box form shows that Dr. Irvin's opinion about the claimant's limitations is not supported by his treatment notes or the record as a whole. Very little to [sic] weight is accredited to Dr. Irvin's statement.

(Tr. 180).

The Court first considers Dr. Irvin's numerous opinions that Plaintiff was "disabled" or was unable to pursue gainful employment. The ALJ's decision to discount those opinions is supported by good reasons and substantial evidence. The Eighth Circuit has repeatedly held that a treating physician's opinion that a claimant is "disabled" or "unable to work" is not a "medical opinion" that is entitled to credit under the regulations, because it is an opinion on a question reserved to the Commissioner. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely 'opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'") (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002)). *Accord Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010).

The Court next considers Dr. Irvin's opinions regarding the impact of Plaintiff's physical impairments, including headaches, gastrointestinal problems, and loss of balance. The Court finds that the ALJ gave good reasons, supported by substantial evidence, for discounting those opinions.

The ALJ reasonably recognized that Dr. Irwin's opinions with regard to Plaintiff's physical limitations were outside of his scope of specialty as Plaintiff's psychiatrist. Moreover, the record does not suggest that Dr. Irvin treated Plaintiff for any of those impairments. *See Dolph v. Barnhart*, 308 F.3d 876, 879 (8th Cir. 2002) (ALJ reasonably gave less weight to opinion of a doctor where the opinion related to disorders outside of his specialty for which he did not treat the claimant). *Cf.* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist").

Finally, the Court considers Dr. Irvin's opinions regarding the impact of Plaintiff's mental impairments on mental ability to perform work activities, such as Dr. Irvin's opinion that Plaintiff's depression, suspicions, and other symptoms would cause him to have difficulty concentrating, to be unable to remember work-like procedures or short and simple instructions, to be unable to maintain attention for a two-hour segment, and to be unable to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. After review of the record, the Court does not find that the ALJ gave good reasons, supported by substantial evidence, for the decision to give very little weight to those opinions. The ALJ's finding that Dr. Irvin's opinions were "completely inconsistent with his treatment notes" does not appear to be supported by substantial evidence in the record. Although the ALJ discussed the mental status examination findings that she thought were inconsistent with Dr. Irvin's opinions (such as findings that Plaintiff was alert, cooperative, made good eye contact, and had no hallucinations), she did not mention the findings that tended to support Dr. Irvin's opinions, including findings that Plaintiff often had an anxious or depressed mood (Tr. 572-73, 580, 708) and often had a depressed, anxious, or pained affect (Tr. 572-73, 651, 667, 708, 998, 1283, 1298). In addition, contrary to the

ALJ's suggestion that Plaintiff consistently denied suspicions, Dr. Irvin's mental status examinations from September 2015 through August 2017 consistently indicate that Plaintiff seemed suspicious or had possible suspicions. (Tr. 998, 1046, 1121, 1262, 1066, 1071, 1082, 1098, 1130, 1159, 1502, 1283, 1298, 1565, 1576, 1581, 1591, 1605, 1616, 1621, 1627, 1642, 1653, 1707, 1723, 1740, 1749). Notably, as Plaintiff's suspicions worsened in the last several months of his notes, Dr. Irvin began to add the diagnosis of severe depression "without psychotic features, rule out with psychotic features (paranoia)" (Tr. 1565, 1576, 1580-81, 1591, 1605, 1616, 1621-22, 1627, 1642), and eventually severe depression "with psychotic features (paranoia)" (Tr. 1283, 1298, 1653, 1707, 1722, 1740, 1749).

Moreover, Dr. Irvin's opinions are also consistent with his notes regarding Plaintiff's complaints. The ALJ also did not discuss, in assessing Dr. Irvin's opinions, Plaintiff's repeated complaints to Dr. Irvin of symptoms such as poor focus, concentration, and/or memory (Tr. 667, 580, 998, 1020, 1046, 1098, 1081, 1262, 1298, 1502, 1591, 1605, 1627) and fatigue or low energy (Tr. 580, 998, 1098, 1580). Significantly, after Plaintiff repeatedly complained of concentration and memory problems, Dr. Irwin referred Plaintiff for neuropsychological testing. (Tr. 1082, 1137-38, 1159). However, neuropsychologist Dr. John R. Hogg wrote that a review of Plaintiff's treatment notes "suggests ongoing mood disorder symptoms as a likely significant contributor to [Plaintiff's] everyday concentration and memory problems" and found that Plaintiff's "elevated mood disorder symptoms will also likely interfere with comprehensive neuropsychological evaluation results." (Tr. 1138). Dr. Hogg indicated that time should be allowed to decrease mood disorder symptoms so that Plaintiff could later participate in neuropsychological testing with a higher probability of obtaining clinically useful results. (Tr. 1138). Dr. Hogg's statements support

Dr. Irvin's opinion that Plaintiff's mood disorder would significantly affect his concentration and cognitive function.

The ALJ also did not discuss the fact that Dr. Irvin referred Plaintiff to a psychotherapist and regularly changed Plaintiff's medications to attempt to address his various symptoms, even suggesting the possibility of antipsychotic medications and inpatient hospitalization as Plaintiff's complaints continued to worsen. (Tr. 1298, 1566, 1722, 1740). These interventions also support Dr. Irvin's opinion that Plaintiff had serious symptoms that would affect his ability to work.

The Court acknowledges that some of Dr. Irvin's specific opinions regarding Plaintiff's mental limitations may be inconsistent with, or unsupported by, his treatment notes. However, in light of the above evidence supporting his opinion, most of which was not discussed by the ALJ, the Court cannot say that the ALJ's decision to give very little weight to those opinions was supported by substantial evidence. On remand, the ALJ should re-evaluate Dr. Irvin's opinions in light of all of the relevant medical and other evidence and should make clear the reasons for the weight given to that opinion.

## VI.  CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of March, 2020.